BEFORE THE UNITED STATES
JUDICIAL PANEL ON MULTIDISTRICT LITIGATION

| IN RE: APPLE INC. SMARTPHONE ANTITRUST LITIGATION | MDL No. 3113 |
|---|---|

**REPLY IN SUPPORT OF MOTION TO TRANSFER RELATED DEVELOPER ACTIONS TO THE DISTRICT OF NEW JERSEY FOR COORDINATED OR CONSOLIDATED PRETRIAL PROCEEDINGS**

**I.      Introduction**

1. Plaintiffs respectfully submit this Reply to Apple Inc.'s Opposition to our Motion to Transfer. In opposing this motion, Apple seeks to obscure the core issues at hand, diverting attention from the clear factual commonalities between the Developer Actions and the ongoing MDL proceedings in New Jersey. The proposed transfer is not burdensome, as Apple contends, but a necessary and just measure to ensure comprehensive adjudication of Apple's far-reaching antitrust violations which directly impact the rights and liberties of every American.

2. Contrary to Apple's assertion that the proposed transfer of Related Developer Actions to the MDL is an act of gamesmanship, it is Apple itself that is engaged in a deliberate and aggressive strategy to thwart any and all regulatory enforcement. This case represents the culmination of over five years of dedicated effort by undersigned counsel to research and prosecute Apple's anticompetitive practices, and Apple's harsh rebuttals are far from being an isolated incident.

3. Apple's resistance to enforcement measures extends well beyond this MDL. For example, Apple aggressively lobbied against Senator Klobuchar's bi-partisan Open App Markets Act, which held 73% popular support, yet somehow never made it to Senate Floor vote. Senator Klobuchar, in

frustration, famously remarked, "I have two lawyers, they have 2,800," highlighting Apple's disproportionate resources and relentless efforts to shut down any legislative threat.

4. Likewise, Apple currently faces contempt proceedings in the Northern District of California, following a motion alleging that Apple violated a verdict under California's Unfair Competition Law (UCL) stemming from another fiercely contested antitrust case brought by *Epic Games*. Internationally, Apple is under scrutiny from the European Union, which has initiated proceedings against the company for non-compliance with its Digital Markets Act. Apple's consistent opposition to these efforts evidences a clear global pattern of defiance against regulatory measures designed to promote competition and protect consumer rights.

5. In this light, Plaintiffs urge the Court to view Apple's objections – which invoke *ad hominem* attacks on an undersigned AUSA antitrust professional, a Microsoft MDL participant, a world-renowned scientist, and two successful developers in two distinct lawsuits – for what they truly are: part of a broader campaign to quash any legitimate challenge to Apple's conduct. Apple's claim that Plaintiffs are attempting to "evade" due process by joining the MDL is a reversal of reality. The true evasion here is Apple's persistent efforts to sidestep legal and regulatory challenges that aim to hold the company accountable for its monopolistic practices.

6. Apple's consistent strategy to evade accountability through a myriad of legal tactics illustrates the need for MDL centralization to prevent further manipulation of the legal process. Given Apple's demonstrated skill at delaying antitrust enforcement, a comprehensive approach is necessary to ensure that all affected parties—both developers and consumers—are adequately represented and their claims fully adjudicated.

## II. STANDARD OF REVIEW

7. Under 28 U.S.C. § 1407, the Judicial Panel on Multidistrict Litigation (JPML) has the authority to transfer cases to a single district for coordinated or consolidated pretrial proceedings, to promote the just and efficient conduct of litigation. To achieve these goals, the JPML often implements

early-stage centralization of complex cases, as demonstrated via *In re Vioxx Products Liability Litigation*, 360 F. Supp. 2d 1352 (J.P.M.L. 2005).

8. The *Vioxx* decision represents well-established, controlling law concerning centralizing litigation to streamline pretrial proceedings. *Vioxx* teaches how the "transferee court can employ any number of pretrial techniques — such as establishing separate discovery and/or motion tracks — to efficiently manage this litigation" (*Vioxx* Transfer Order, at 3). This flexibility allows the transferee judge to balance the needs of the litigation, handling both common and individual issues concurrently, thereby reducing duplicative efforts and fostering judicial economy.

9. Moreover, the *Vioxx* case highlights that the JPML does not easily concede to arguments opposing centralization, as evidenced by its response to plaintiffs who argued against inclusion in the MDL on grounds of predominance of individual factual questions. The Panel stated they were "not persuaded by the arguments of some opposing Texas plaintiffs and the New York third-party payor plaintiffs" (*Vioxx* Transfer Order, at 3). This is analogous to the present context, where distinctions might be drawn between different types of plaintiffs—such as developers versus purchasers—involving an identical product and monopolist.

10. Additionally, the *Vioxx* ruling distinguishes between claims that are sufficiently related to the central issues of the MDL and those that are not. In *Vioxx*, claims involving a different prescription drug were excluded from that MDL. This is comparable to the present case, where claims involving another app store, such as Google Android Play, might be considered unsuitable for inclusion in an MDL focused primarily on Apple iPhone related issues.

**III. ANALYSIS**

**A. Apple's Failure to Object to the Inclusion of Developers**

11. Nowhere in Apple's 18-page objection does it argue that developers, as a general category, should be excluded from the MDL. The entirety of Apple's argument centers around COVID-19[1] app developers, specifically targeting the claims of Coronavirus Reporter Corporation (CRC) and PhantomALERT, which represent a small subset of app developers impacted by Apple's anticompetitive conduct. By failing to object explicitly to the inclusion of all developers, Apple has effectively conceded that general developers—like Greenflight Venture Corporation—rightfully belong in the MDL.

12. Apple's omission is particularly significant given that the MDL's formation was predicated on the relatedness of developer actions to the underlying DOJ antitrust action against Apple. The DOJ Complaint meticulously details how Apple's monopolistic practices harm developers, which in turn harms consumers by reducing innovation and consumer choice. Apple's failure to counter the relevance of developers, generally, to these overarching claims is a tacit acknowledgment that the issues raised by these developers are indeed germane to the MDL's scope.

13. Apple's decision not to directly challenge the inclusion of developers in the MDL appears to be a calculated move to avoid potential legal ramifications in the Department of Justice case. The DOJ's antitrust complaint against Apple specifically alleges that Apple imposes "harsh contractual and legal barriers" on developers' ability to seek legal redress, forming a deliberate effort to suppress legal challenges to its market control.

14. If Apple were to argue that developers should not be part of the MDL, it would risk admitting that it has actively sought to hinder developers' rights to seek legal recourse, or at least giving a strong inference to this effect. Such an argument could be construed as evidence of Apple's intent to

---

[1] Apple asserts the same erroneous argument as the now-withdrawn Majority Plaintiffs' objection, which claimed COVID-19 developers are not related to the MDL's smartphone purchasers class. Plaintiffs filed a detailed reply, incorporated herein, clarifying that the injuries to developers and consumers are intertwined under the DOJ's framework. After productive conversations with the group, encouraging preliminary agreement supports the addition of a Smartphone Developer track to the MDL. Plaintiffs recognize the leadership's willingness to engage in constructive dialogue to reach a fair outcome for all stakeholders in this landmark case.

maintain its monopolistic practices unchallenged, thereby reinforcing the DOJ's allegations. By avoiding a direct opposition to developer inclusion, Apple strategically sidesteps a situation where it could be seen as admitting to conduct that further supports the DOJ's case.

15. A direct opposition would also be plainly false, as Apple knows the underlying New Jersey litigation pertains to developers and that they are central to the DOJ's antitrust allegations. Given the backlash from previous legal positions—such as Apple's argument in the Ninth Circuit that "censorship is not an [Sherman] antitrust injury"—Apple likely recognizes that overt opposition to developers would only serve to cast the company in a more unfavorable light.

**B. Apple's Defense Strategy: Dismissing Legitimate Innovators and Good Samaritans[2]**

16. By way of background, the FAC describes the Plaintiff CRC's founder:

    *Dr. Robert Roberts, the Chief Medical Officer for Coronavirus Reporter, is a widely recognized figure in academia whose work has impacted the lives of many. Prerequisite to nearly every cardiac procedure or hospital screening for myocardial infarction ("heart attack") is laboratory blood analysis to detect damaged cardiac muscle tissue. In the 1980s, Dr. Roberts pioneered the MBCK blood test used for two decades as a "gold standard," and which directly laid the foundation for the current troponin lab test. Dr. Roberts earned the trust of NASA as Shuttle Cardiologist. Apple, however, deprived its userbase the benefit of Dr. Roberts' scientific expertise and dedication towards saving lives, when the Defendant corporation improperly blocked his app in February 2020 to develop their own.*

17. Apple's Objection opens with a different narrative: "The claims in *Coronavirus Reporter* and *PhantomALERT* are those of disgruntled app developers" (*Apple Opp.*, p.6 Line 1). Any review of Apple's antitrust pleadings makes clear the company now possesses a disdain for developers, in stark contrast to their early days. To Apple, developers have become a commodity resource to be exploited, rather than a group of talented scientists, professionals, and creative thinkers. Developers fuel Apple's growing services, making Apple the modern-day 'robber baron.'

18. Apple's reference to Dr. Roberts, or any of the development teams, is entirely inappropriate and demonstrates the company's approach to subverting legitimate inquiry into its conduct. Calling Dr

---

[2] Meta's CEO Mark Zuckerberg apologized last week for censoring COVID-19 content. Apple, apparently, is still in denial.

Roberts – whose work saved millions of lives – disgruntled is inexcusable. Similarly, PhantomAlert's developer pioneered a driving safety app road hazard system, which has been copied and is now standard issue on Google Maps and Waze. During the first weeks of COVID, he partnered with the Ethiopian government to create his COVID app. CRC's programmer has had an enviable record of success as a computer scientist,[3] developing a free Caller-ID app, and underlying patent, used by around three hundred million users. All three of these individuals simply wanted to use their abilities to help people during COVID. Apple – after botching its own COVID app – shamelessly tells the Judicial Panel that these good Samaritans are "disgruntled." The opening line of Apple's objection is all the JPML needs to know as to the benefits of transferring this motion. The MDL is the perfect venue to prevent such disrespect. Judge Neals will quickly observe that not every developer on the planet is 'disgruntled,' and Apple's 'whack-a-mole' strategy to bring down good people who question Big Tech will, at long-last, cease.

19. The plain reality, as evidenced by a news article and commentary last week, is that Apple's leadership is under legal obligation to cease its antitrust violations, and many commentators believe it is just a handful – and shrinking – responsible group at Apple. Attacking US Senators, developers, EU lawmakers, and contempt of US judges has become the norm for this small group – which WSJ described as increasingly worrisome app store conduct. The JPML should disregard unfounded criticisms of developers and their attorneys' diligent work-products. (Ex. B)

**C. Apple Relies Upon Forty-Nine Plaintiffs' Withdrawn Objection and Clerk's Screening**

20. Under JPML Rule 7.1(b)(i), the Clerk's initial decision is a preliminary administrative action. Rule 7.1(b)(i) states: "If the Clerk of the Panel determines that a potential tag-along action is not appropriate for inclusion in an MDL proceeding and does not enter a CTO, an involved party may move for its transfer pursuant to Rule 6.1." This rule exists to ensure that all parties have the

---

[3] CRC's programmer also has an MD and attended Vanderbilt Law School; he formed the early notary stamps theory.

opportunity for a full and fair hearing on the merits, beyond an initial administrative review.

21. By definition, and pursuant to JPML Rules, the Clerk's preliminary decision was made without the benefit of a comprehensive briefing. It is not intended to be a final determination on the merits of a case's inclusion in an MDL Hence, Apple places undue emphasis on this preliminary review. By mentioning it several times, along with forty-nine other plaintiffs' (now withdrawn) position, it becomes evident the Defendant cannot go on the record as saying iPhone Developers are unrelated to this MDL.

**D. CRC and PhantomAlert Complaints based on Identical DOJ Relevant Market**

22. Apple does not—and indeed cannot—present a substantive argument against the inclusion of developers in the MDL, because they hold a significant role in the DOJ's case. Notably, the revisions provided in the Amended Complaint were not part of the initial administrative review. The new operative complaint was developed in close consultation with government antitrust experts, including Plaintiffs' counsel Melissa Theriault, who prosecuted antitrust matters as an AUSA. It presents substantial claims that intersect directly with the core issues of the MDL and the DOJ's litigation against Apple. Apple challenges the FAC because its notary stamp and *Aspen* claims for relief, now augmented with the DOJ's broader Sherman claim, represent a highly refined approach to emerging digital markets antitrust litigation. While the DOJ's complaint may suffice as-is, it is notably subject to a 12(b)(6) motion and may need to detail downstream app markets. It is certainly a possibility that the DOJ lawsuit may eventually allege app markets similar to those which the undersigned counsel have studied for five years. These market additions, even if redundant, do not render the case unrelated to the MDL.

23. Instead, Apple attempts to dismiss the developers' claims as mere "splicing" of the DOJ's allegations, a characterization that misrepresents the detailed and nuanced work reflected in the Amended Complaint. Nor is CRC/Greenflight's Amended Complaint a "hodgepodge" of pieces of the DOJ complaint. It represents a tireless effort to innovate digital markets antitrust theory, in

which traditional pricing metrics often do not apply to free apps, but where user attention and time are monetized. The FAC alleges a market for notary stamps which forms the core technological basis for Apple's 'locked-in' ecosystem.[4] Significantly, Apple's contempt for the EU DMA and *Epic UCL* would not be possible if those had directly litigated the notary stamp mechanism.

24. Apple incorrectly argues that Plaintiffs "acknowledge PhantomALERT is a 'facsimile' of the original *Coronavirus Reporter*, and ... effectively concede that copying in parts of DOJ's case is a sham." Referring back to the document Apple cited, it is clear their position is dishonest. Undersigned counsel wrote "*PhantomAlert* (DC District) has filed a developer class action which Apple has termed 'a facsimile of Coronavirus Reporter.'" The cases have certain overlap, but represent wholly independent work from different antitrust lawyers.

25. First, as PhantomALERT's filings make clear, their Amended Complaint invokes the *DOJ v. Apple* Sherman Relevant Market for US Smartphones. See Exhibit A. That alone is a compelling basis for inclusion in this MDL. Moreover, PhantomAlert's counsel makes clear that the conduct at issue in their case is related to developer conduct addressed in *Epic v. Apple* and *Epic v. Google* – general app store competition constraints, rather than distinct COVID-19 matters.

26. Likewise, PhantomAlert's legal team is comprised of seasoned antitrust attorneys who participated in the related *Microsoft MDL*. Apple is aggressively fighting to prevent them from amending[5] the DOJ's smartphone relevant Sherman market into their case, which the Opposition omits mention.

27. Therefore, Apple's contention that the Plaintiffs' cases involve "different markets" is both factually inaccurate and legally irrelevant. The DOJ Complaint's primary foremarket forms the basis of both Complaints under consideration by the JPML. Plaintiffs have added several

---

[4] Per the FAC, "notary stamps are not high technology. They are analogous to a turnstile entrance at a circus fair, a toll booth, a governor on a performance racing car, or a padlock on a VCR. Not only are they not high technology, they do not represent integral functionality of a computing device or an operating system. To wit, they are the opposite: reduced functionality and reduced value of the host device."

[5] The parties stipulated on an extension for PhantomAlert to respond to Apple's 12(b)(6) motion. At the conclusion of that period, PhantomAlert filed an amended complaint based on DOJ Sherman market theory. Apple claims that PhantomAlert's extension on a responsive pleading did not include the right – once as a matter of course – to amend.

developer-specific related markets. Whether or not the DOJ ultimately alleges similar app markets during trial – which is certainly a possibility – does not demonstrate cause to oppose centralization and transfer of Related Developer Actions.

**E. Premature Arguments on *Res Judicata* are Irrelevant and Improperly Raised**

28. The Panel's role under 28 U.S.C. § 1407 is to determine whether cases should be consolidated for pretrial proceedings based on common questions of fact, not to adjudicate the merits of *res judicata* defenses. Apple's opposition could be construed as an attempt to litigate pre-trial motions, specifically raising arguments related to *res judicata*. Nonetheless, Defendant's *res judicata* appears to be a frivolous defense. Apple's attempt to insert this issue into the current discussion is not only irrelevant but also an improper effort to circumvent the purpose of the MDL process.

29. Numerous JPML rulings affirm that transferee courts in MDLs are well-equipped to handle all pretrial proceedings, including dispositive motions. The Panel has consistently held that the presence of complex or unique legal issues does not preclude transfer; instead, the transferee court is deemed capable of efficiently managing these issues.

30. Here, *Vioxx* is controlling law. Similarly, *In re Phenylpropanolamine (PPA) Prods. Liab. Litig.*, 173 F. Supp. 2d 1377 (J.P.M.L. 2001) emphasized that the presence of potentially dispositive legal issues did not preclude transfer, as the transferee MDL court was capable of addressing such matters efficiently. Apple cites *In re Accutane Prods. Liab. Litig.*, 560 F. Supp. 2d 1370 (J.P.M.L. 2008), to suggest that unique legal issues potentially dispositive of the entire action weigh against transfer. However, *Accutane* is distinguishable and not representative of the broader trend in MDL jurisprudence.

31. In *Accutane*, the JPML emphasized the presence of unique legal issues specific to Texas state law, which were central to the determination of the entire case. The Panel found that the case would be better resolved in the originating court familiar with those specific legal nuances. However, this decision does not establish a broad principle that every unique legal issue militates against transfer;

rather, it pertains to particular circumstances where state-specific laws were predominant.

32. Here, Apple does not cite any unique circumstances warranting treatment of this case per *Accutane*. Apple merely asserts conclusory statements about uniqueness. Plaintiffs' have not seen any proposed *res judicata* motion by Apple, nor has Apple indicated why Judge Chen is uniquely positioned to adjudicate it. That sets makes *Accutane* inapt as case law[6].

33. Nonetheless, Plaintiffs may properly object that Apple's purported *res judicata* defense appears futile. CRC has never been named as a party in any prior litigation. Greenflight Venture Corp, the source of all operating funds available to CRC, was only once involved in litigation back in 2016, concerning a patent invalidation claim filed by its competitor, Whitepages.com[7]. Furthermore, Apple made unequivocal statements, spanning years in various district and appellate courts, that "Coronavirus Reporter" [2021 lawsuit] had *no relation* to world-renowned scientist and NASA cardiologist Dr Robert Roberts. CRC, of which Dr. Roberts is a founder and Chief Medical Officer, is represented for the first time in litigation by undersigned attorneys Theriault and Mathews.

## IV. CONCLUSION

34. For the reasons set forth herein, Plaintiffs respectfully submit that the JPML should grant the motion to transfer Related Developer Actions to the District of New Jersey, for coordinated or consolidated pretrial proceedings.

Respectfully submitted this First day of September, 2024,

/s/ Keith Mathews

| | |
|---|---|
| Keith Mathews | Melissa R Theriault |
| AMERICAN WEALTH PROTECTION | Woodhouse Roden Ames & Brennan, LLC |
| 1000 Elm Street, Suite 800 | 1912 Capitol Ave. Suite 500 |
| Manchester, NH 03105 | Cheyenne, WY 82001 |
| 603-622-8100 | (307) 432-9399 |
| keith@awplegal.com | melissa@wrablaw.com |

---

[6] Undersigned counsel vehemently denies any attempt to evade Northern California. As the JPML is aware, the *Levine Motion*, served on Plaintiffs in Wyoming, sought to transfer the MDL to New Jersey. *Chiuchiarelli* sought California. Plaintiffs were indifferent to either venue, and simply hope to join the MDL in either location to obtain 'critical mass' to effect necessary change against Big Tech. Accordingly, Plaintiffs did not file a response to the *Levine Motion,* instead taking a neutral position.
[7] The USPTO ultimately awarded Greenflight a reissue patent for its substantial work bringing free Caller-ID to the web.